This is a suit for a permanent injunction to restrain the borough of Essex Fells from disconnecting from its sewer system a lateral sewer situate in Devon road, presently connected with the system at Oval road. The lateral sewer in question runs north from Oval road for some three thousand four hundred and fifty feet, and was originally built in the years 1928 and 1929 by the complainants, who as trustees are engaged in the development and sale of property in the borough of Essex Fells.
At the time the lateral sewer was laid the complainants as trustees owned all of the property to the north of Oval road, and at present still own the greater part thereof. The defendant *Page 203 
borough threatens to discontinue the existing connection because of alleged excessive infiltration of surface water into the lateral sewer, by reason of which it is claimed that the sewage disposal system of the borough is over-burdened. There is no doubt that the cutting off of the lateral sewer would cause irreparable injury to the lands of the complainants, and to the occupants of those lands sold by complainants, by the resultant backing up of sewage and its overflow, thereby creating a private as well as a public nuisance and otherwise decreasing the value of the lands. For this reason a preliminary injunction was granted (116 N.J. Eq. 350) pending final hearing.
The borough seeks to justify its threatened action by insisting that the lateral sewer is a private sewer connected to the main system without the borough's knowledge or consent; that the lateral sewer was never accepted by the borough, that the complainants are mere trespassers and that the lateral sewer is therefore subject to be disconnected at the will of the borough.
Complainants, on the other hand, contend that the lateral sewer was built pursuant to an agreement with the municipality whereby they were to construct and pay for the lateral sewer and dedicate it to the borough upon completion, rather than to have the borough construct it as a public improvement and assess the cost thereof against the lands of complainants.
Originally the borough sewer system was privately owned, having been purchased by the borough as an operating plant in the year 1921. Thereafter a comprehensive plan for the drainage of the borough was prepared by the engineering firm of Fuller and McClintock, covering not only future location of sewers but also making recommendations regarding materials to be used.
Complainants' testimony show that in the year 1928 they determined to develop that portion of their lands in the neighborhood of Devon road (then known as Golf road) and so cleared the roadway which until that time had existed only as a paper street on the north side of Oval road. At about the same time one of the complainant trustees, who was also the mayor of the borough, broached to the members of the *Page 204 
borough council at the informal meetings, which it seems, always preceded the regular meetings of the council, the proposition that the contemplated lateral sewer in Devon road be constructed and paid for by the trustees and upon completion turned over to the borough. In accordance with the recommendations contained in the report of the engineers, the lateral sewer was to be constructed of eight-inch vitrified tile pipe, and was to connect with a sewer main to be constructed in Oval road. At first it was contemplated that the actual construction should be supervised by a firm of engineers, but before the work was undertaken it was decided that one Millard Van Dien, who among other offices held the office of borough sewer operator, performing the duties of superintendent of sewers, should inspect the work and report to the council from time to time, the engineers to survey the line of the sewer, set grades, c. Work was commenced in November, 1928, and was completed in January, 1929. Up to that time the borough had not constructed the Oval road main, as shown in the report of the engineers, so that no immediate connection of the Devon road lateral sewer to the borough system could be made. When in the summer of 1929 the Oval road main was built, a connection was run over by borough employes to the terminus of the Devon road lateral sewer (which extended only to the north line of Oval road) from a drop manhole in the Oval road line, and both sewers were then placed in operation. Thereafter three houses were connected by the borough with the Devon road lateral sewer, the first in 1929, the second in 1930, and the third in 1932. In 1934 the complainants were notified that excessive infiltration was occurring in the lateral sewer, and that unless repairs were made within sixty days, the lateral sewer would be disconnected at the Oval road manhole. Thereupon the bill of complaint was filed in this cause.
On the part of the defendant considerable testimony was offered touching the existence and volume of infiltration, the consequent effect on the disposal plant, the alleged unsatisfactory construction of the lateral, the merits of iron pipe as opposed to tile pipe, the alleged incompetence of the workmen building the lateral sewer, and as to whether or not the *Page 205 
lateral sewer was built pursuant to any prior arrangement between the borough and the trustees. In my view of the case, all of these matters are beside the issue, though it may be as well to state that the evidence does not in my judgment justify the conclusion that the sewer was improperly constructed. From the evidence, the infiltration may have been as well due to house drainage or defective house connections made by borough employes as to improper original construction. The borough admittedly did not dig up any portion of the line to verify its claim that the infiltration was due to faulty joints; it merely measured the infiltration at the Oval road manhole. Unless other possible causes are excluded, it cannot be presumed that the infiltration is due to one particular cause, namely, defective construction.
The only issue in this case, as I view it, is whether the borough accepted the lateral sewer, and I hold that the borough did in fact accept it by connecting it with the system in the summer of 1929. Complainants' testimony concerning the original arrangement under which the lateral sewer was built, while it affords the only credible and rational explanation of the subsequent events shown to have occurred, is not the controlling fact, since complainants by their bill admit a dedication. Granting an acceptance, the lateral sewer may have been constructed as a purely gratuitous act, without prior arrangement. Nor is the existence of infiltration of any moment; assiduous attention to defendant's experts has convinced me that there is infiltration from some undetermined source, but whatever its cause it cannot destroy the effect of the borough's acceptance, if any there was. That the disposal plant is burdened by this infiltration may be of great concern to the borough but it is nevertheless essentially its own problem, to be solved by it in the same manner as another administrative project, but certainly not by severing the connection of the lateral sewer to the main. Complaints concerning the physical construction of the lateral sewer, the materials used and the skill of the workmen employed, even if the evidence showed them to be justified (which it does not) come too late now. These matters were properly cognizable before acceptance and cannot now, five years after acceptance, *Page 206 
be invoked to undo whatever situation may have been created by the considered acts of the borough.
It is admitted by the complainants that following the completion of the lateral sewer no written offer to dedicate was made to the borough; it is likewise admitted that the borough never adopted a resolution formally accepting the offer of dedication. However, the doing of these acts was not requisite to constitute an acceptance of the lateral by the borough, since I am constrained to find that the borough did certain acts, through the instrumentality of its duly authorized officers, agents and servants, which conclusively prove that it unequivocally committed itself to dominion over and ownership of the lateral sewer to the same extent as if by formal resolution of acceptance.
Of paramount importance is the making of the connection between the Devon road lateral sewer and the Oval road main. Complainants claim that the connection was made by workmen employed by the borough in the construction of the Oval road main at the command of the inspector for the borough, who was under the direction of an engineer employed by the borough to supervise the construction, such engineer being responsible to the chairman of the sewer committee, who was himself a member of the borough council and who was the individual who gave the order for the making of the actual connection. The inspector and the engineer were positive in their testimony that the connection was made in the manner claimed by the complainants; the councilmen they named as having given the order (the chairman of the sewer committee) flatly denied it. His denial would have carried more weight had it not been coupled with an unnecessarily lengthy explanation of the reasons why he claimed he would not have given such an order, which ultimately simmered down to the specific complaint that the trustees were using tile pipe instead of iron pipe, and that he had come to the conclusion, before the lateral sewer was built, that no more tile sewers should be constructed in the borough. Aside from the fact that tile pipe was precisely what had been recommended by the engineering firm of Fuller and McClintock as suitable for use in the area of Devon road, the proofs showed that several months *Page 207 
after the completion of the Devon road lateral sewer, another lateral sewer was built of tile pipe in another street in the borough, upon which street this witness lived, and that he daily viewed the construction without protest.
The defendant borough offers no explanation of how the connection came to be made. Several of defendant's witnesses referred to it as "surreptitious;" perhaps they would have me believe that it was made by the workmen of the trustees who built the lateral sewer. But the trustee in charge of the construction testified that the connection was made by the borough's men working on the Oval road main, and not by his men, as did also the foreman of the Devon road crew. In addition, the plumbing contractor who made another connection on the south side of the same manhole testified that he did not make that connection under discussion. That there is a connection is admitted; the weight of the evidence can lead to no other conclusion but that it was made by borough agents at the direction of the councilman in charge of the sewer committee, which committee was shown to consist of the entire membership of the council. Mute corroboration of complainants' story is afforded by the conduct of Van Dien at about the time the connection was made, assuming the truth of Van Dien's own testimony on this point. One of the trustees had inquired of him when the connection would be made and was informed that the only person who could authorize it was the chairman of the sewer committee. Thereafter when Van Dien saw the connection being made, although he saw and spoke to that trustee, he did not then ask whether the authorization had been given, nor did he ask the chairman whether he had given authority, nor did he ever discuss the matter of the connection with anyone. Now considering that Van Dien, who according to the evidence, was the chief administrative officer of the borough, holding so many positions that he was characterized by one of the councilmen as the "borough handyman," and that among such positions he was also borough sewer operator and borough sewer superintendent, his complete unconcern and apathetic disinterest with what was happening points either to neglect of his duties or to thorough familiarity with the *Page 208 
plan under which the lateral sewer was built. I am satisfied that Van Dien was at all times thoroughly cognizant of all that happened and his failure to protest satisfies me beyond doubt that all that was done was performed with the full knowledge and consent of the municipal governing body.
Not only was the connection made by the borough, but the cost thereof was paid for by the borough council as an extra on the Oval road contract. Specifically, the sum of $170.36 was voted in payment thereof. This amount was computed by the borough's inspector on the Oval road main, and by him entered in his field book, from which was drawn the so-called "second estimate" which was approved by the borough's engineer in charge, by Van Dien, by the chairman of finance committee, and by the chairman of the sewer committee. Thereafter this second estimate was submitted to the council and by unanimous resolution was ordered paid. In view of the overwhelming evidence that the borough paid for the connection, I am not impressed by the defendant's witnesses' egregious explanation that it was assumed by the council that this item represented the cost of connecting another lateral sewer on the south side of Oval road. In fact, this other connection was made by a plumbing contractor who not only did not submit a bill therefor but instead paid to the borough a fee for the privilege of making the connection. Nor does the testimony favor an innocent oversight of this item. The practice of the borough with respect to the payment of bills required their careful check by the borough superintendent (Van Dien), the mailing of an itemized list of bills to each councilman three days before each meeting, the approval of bills by the proper committee head, the submission of bills to an audit committee of three councilmen, the payment thereof ordered by resolution of the entire council, and the mailing of an itemized statement of all bills paid to each councilman after each meeting. I cannot believe that with all these safeguards against the payment of improper items, at least one member of the council, at some point in the chain, would not have questioned this particular item had it been improper or unauthorized. *Page 209 
In addition to the making of the connection and the payment of the cost thereof, the borough not only provided a drop manhole in the Oval road line that was obviously designed to receive the Devon road lateral sewer, but also lowered that manhole when in the course of construction it became apparent that the designed level was too high to properly connect with the lateral sewer. The plans for the Oval road main were drawn by an engineer employed by the borough, at the direction of the council generally, with the specific instructions relating to the Devon road lateral sewer emanating from the chairman of the sewer committee. None of this is contradicted, the councilmen who testified for the borough disclaiming all knowledge of this aspect of the case. It must therefore be taken as admitted that the Oval road main was constructed, in accordance with the Fuller and McClintock plan, with the definite intention to connect with the Devon road lateral sewer already installed and awaiting connection.
After making provision for the lateral sewer connection, and after making the connection, and paying for it, the borough further evidenced its attitude toward the lateral sewer by requiring applications for three house connections thereto, demanding and accepting the connection fee of $50 for each, and sending its employe to dig up the road, tap into the lateral sewer and lay pipe from the lateral sewer to the curb, the pipe having been bought and paid for by the borough. Some attempt was made to dispute the making of these connections by the borough, but the testimony of the very employe who made them was clear and unshaken. The only answer by defendant's witnesses to the proof of the acceptance and retention of the connection fees was that the councilmen did not know about them.
On this branch of the case, the borough introduced evidence showing that when the third application was granted the complainants signed a paper-writing admitting that the granting of that permit should not be taken as an acceptance of either the street or the lateral sewer by the borough. Passing the objection taken by the complainants that the writing was signed by only one of the trustees, whereas the recorded declaration of trust under which they operate requires the signatures *Page 210 
of at least two to bind them, and that in this case no benefit moved to them, the writing is still of no effect. It was demanded in this case by the borough that the writing be signed by the house owner, the plumbing contractor, and the trustees. The trustees had no interest in the matter, but the owner and contractor were anxious to get on with the work. Whether coercion was exercised against the owner and contractor is immaterial. One of the trustees, aware that the trustees had no interest, having no concern with the vagaries of municipal administration, and apparently wishing as a friendly act to facilitate the contractor's plans, signed the writing as demanded. Why in this instance the borough required this unusual form of application after having permitted two previous connections to be made in the usual form, was not disclosed. All of the councilmen who testified said that they did not now why that form of application was required, but hazarded the guess that they were advised so to do by the borough counsel, who was not called as a witness. Whatever the reason may have been, the writing cannot have any effect upon the question of acceptance vel non. The borough's demand that it be signed was itself an acknowledgment that it had accepted the dedication. That is to say, if the lateral sewer and street had been unaccepted, no permit would have been required to connect through the street to the lateral sewer, since by hypothesis it was not a public sewer, the very insistence upon an application for a permit in any form, was in itself an act of dominion over the lateral sewer.
Although a number of councilmen and former councilmen took the stand for the defendant, their testimony on the vital aspects of the case as above indicated was of little or no help to the court. Their testimony consisting as it did of denials of knowledge and failures to remember, is not only of no probative value, but on the contrary lends weight to complainants' testimony. In the face of evidence that a given act occurred, no issue of fact is created by a witness who testifies that he knows nothing about it or that he does not remember that it has occurred. So with respect to the agreement that the lateral sewer should be built by the trustees and turned over to the borough, not one councilman denied that the matter *Page 211 
was ever discussed, but all said that they did not remember it. Either the subject was discussed or it was not discussed; complainants' testimony that it was should surely have kindled some spark of recollection in the memories of the councilmen who were present in the courtroom while the testimony was being received.
Could this lateral sewer have been built in the small community of Essex Fells, the Oval road main prepared to receive it, the connection made and paid for, the whole placed in operation and houses connected to the lateral sewer by borough employes, all without the knowledge of the councilmen? Taken in its aspect most favorably to them, their testimony may be summarized as consisting of assertions that they have no knowledge or recollection of any of the acts of acceptance, and that they never voted to do anything in any way related to the Devon road lateral sewer. Their testimony is effectually contradicted by the official records of the borough itself.
The law applicable to this case is well settled and needs but scant exposition. It was established in the early case of Mayor,c., of Jersey City v. Morris Canal and Banking Co., 12 N.J. Eq. 547,
that a dedication is a devotion of land or an easement therein to public use, by any act, however informal, manifesting such an intention. In this case the sewer offered for dedication was from the outset intended to be dedicated to the knowledge of the municipality, hence there was no necessity for an additional formal offer upon its completion.
Defendant contends that where an acceptance is relied upon to charge a municipality with the burden of repair and maintenance of the subject of the dedication, only an acceptance by formal resolution of the governing body is sufficient to bind the municipality. In the first place, there is no evidence in the case from which it can be concluded that the dedication and acceptance of the lateral sewer imposed a burden upon the municipality. The evidence of infiltration goes to a time some four years after the dedication; it may well be occasioned by some supervening cause. The complete absence of any credible evidence of defective construction, both as to materials and workmanship, impels me to conclude that far from imposing a burden, the dedication conferred a benefit *Page 212 
upon the borough, in that it was presented with a complete lateral sewer at no cost to it, save the cost of connecting it with the main. Even assuming that a burden was imposed by the dedication of the lateral, defendant misconceives the law applicable to the question of acceptance. There is no case in this state which has been brought to my attention in which it is held that a dedication must be accepted by formal resolution, either to benefit or to burden the municipality. The extent of previous declarations has been only that the municipality must take "formal action," make "formal adoption" or "in some way accept" the dedication. Holmes v. Jersey City, 12 N.J. Eq. 299; Pope v. The Town of Union, 18 N.J. Eq. 282; Trustees ofM.E. Church, Hoboken, v. Mayor, c., of Hoboken,33 N.J. Law 13; Hoboken Land and Improvement Co. v. Mayor, c., of Hoboken,36 N.J. Law 540; Wood v. Hurd, 34 N.J. Law 87; Mayor, c., ofBrigantine v. Holland Trust Co., 35 Atl. Rep. 344; Booraem v.North Hudson County Railway Co., 39 N.J. Eq. 465; New York andLong Branch Railroad Co. v. Mayor, c., of South Amboy,57 N.J. Law 252; 30 Atl. Rep. 628; Arnold v. City of Orange, 73 N.J. Eq. 280.
"By `formal action,'" said our court of errors and appeals, "is not meant the passing of a formal resolution by the terms of which the dedication is accepted, but such action as conclusively shows an intention to presently treat the dedicated land as an existing public way. * * * In fine, any formal action with relation to property dedicated to public use as a highway, taken by the representatives of the public having authority over highways, which can only be legally justified upon the theory that the land dedicated is presently subject to a public user, constitutes a formal acceptance of the dedication." Schmidt v.Spaeth, 86 N.J. Law 179. If in the previous cases there had been any doubt what "formal action" meant, the question is no longer open to dispute.
There can be no doubt that when the borough of Essex Fells connected the lateral to its main sewer at the order of the chairman of the borough sewer committee, and the borough council authorized the payment for the connection by unanimous vote, received into the borough system and disposed of *Page 213 
the effluent of the lateral for several years, demanded and received three fees for three house connections to the lateral, and sent its workman to make those connections with its own materials, that this was "formal action * * * which can only be legally justified upon the theory that the land [sewer] dedicated is presently subject to a public user." That the effect of its act is to make it liable to maintain and repair the lateral at some future time is of no moment here, in a court of equity the municipality cannot to the injury of an owner whose dedication it has accepted repudiate such acceptance when for any reason it becomes dissatisfied with the gift it has accepted.
A permanent injunction will issue, pursuant to the prayer of the bill.